## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| WILLIE L. CARTER | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| VS. | ) | **CASE NO. CV 02-1015-DRH-PMF** |
| | ) | |
| D. HECHT and Sgt. Childers (stayed | ) | |
| pursuant to order at Doc. #93), | ) | |
| | ) | |
| **Defendant.** | ) | |

### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**FRAZIER, Magistrate Judge:**

This matter is before this Court following an evidentiary hearing. Plaintiff brought this case

pursuant to 42 USC §1983. He claims that defendant failed to protect him from attack by another

inmate and that this violated his constitutional right to be free from cruel and unusual punishment.

Plaintiff has been incarcerated in the Illinois Department of Corrections (IDOC) since 1987.

He serves a 30-year sentence for home invasion. Prior to entering IDOC, plaintiff belonged to the

Gangster Disciples (GD's), a street gang which claims as members a substantial number of Illinois

prisoners. Naturally, plaintiff continued his affiliation once incarcerated. According to plaintiff,

the length of his sentence along with his prior affiliation made him appropriate to hold various

positions of responsibility with the GD's in prison. At the Pontiac Correctional Center, he was his

unit's treasurer which placed the income from weapons and drug transactions under his control.

Also due to the length of his sentence, he was deemed appropriate by his superiors to provide the

ultimate solution to an intra-gang disciplinary problem. That is, he was ordered to stab another GD

who had fallen from favor. Plaintiff violated a cardinal rule when he refused that assignment and

compounded that indiscretion by violating his fiduciary responsibility as unit treasurer — he stole

the $300-$400 under his care and control.  Plaintiff figured that he had nothing to lose because his refusal to carry out the ordered assault was going to get him killed anyway.  Plaintiff promptly entered protective custody (PC), where he broke the other rule which shall not be broken, he informed on other GD's.   Plaintiff's GD bridges were officially and eternally burnt.  All of this occurred in 1991.

During November of 1991, plaintiff transferred to Menard Correctional Center.  The institution was locked down when he arrived.  PC was full, so he was sent to the south cell house, a low aggression unit.  He cell mate was a GD, the gallery treasurer.  Another inmate who knew plaintiff at Pontiac told plaintiff's cell mate of plaintiff's history at Pontiac.  The cell mate advised plaintiff to get himself to PC.  In very short order, GD hit men arrived at his cell and tried to set it afire.  Plaintiff was advised that more was coming.  That night, he was moved to PC.  During December of 1998, plaintiff was attacked in PC by his cell mate, a GD who had manipulated his way into PC simply to attack plaintiff.

In June of 2002, plaintiff was moved from PC to the segregation unit for six months following a disciplinary matter.  He entered segregation in cell 703 on single man cell status.  On June 10, 2002, defendant Hecht, an IDOC correctional officer, moved plaintiff to segregation unit cell 533, a double man cell.  The move occurred despite plaintiff informing Hecht that he could not move into a cell with a population inmate.  Plaintiff appealed his placement to the unit supervisor to no avail.  His cell mate was Charles Mullen.  Mullen was also a GD, and was the unit security officer.   Other inmates soon informed Mullen about plaintiff, and Mullen interrogated plaintiff himself.  He told  plaintiff that he would have to move from the cell.  Plaintiff's predicament, that he was celled with a GD who wanted him out, was quickly conveyed to Hecht.  Having to tell Hecht

about everything in front of Mullen did not do much to improve plaintiff's status with his cell mate.

Plaintiff was not moved.  Hecht explained that no other space was available.  Plaintiff appealed to

the Unit Supervisor, Mr. Spiller, who approved plaintiff's placement with Mullen.

Mullen eventually attacked plaintiff on July 20, 2002.  That resulted in "a busted lip and

some bruises."  Plaintiff is a slightly built man, perhaps 160 pounds. He described Mullen as 6'3"

and 260 pounds.   The beating's aftermath was on the low end of the pain and suffering spectrum,

strongly suggesting it was unlikely that Mullen intended to seriously harm plaintiff on that day.

Plaintiff sought no medical treatment that has been documented.  By his own testimony, he had no

desire to fight with Mullen.  All things considered, one would expect that had Mullen's attack been

calculated to cause plaintiff great harm, that is exactly what would have happened.

Mullen attacked plaintiff again two days later, on July 22, 2002.  No serious or permanent

injuries resulted.  Plaintiff had a bloody ear, some ringing in that ear for a few days, and some

headaches for which he was treated and released in the medical unit.  He is fully functional today.

He hopes to be out of prison in a couple of years and to obtain employment on a river boat.

Plaintiff testified that he told Hecht about the first attack at least twice before the second.

On cross, plaintiff was less certain that he had informed Hecht of the July 20 attack.  After the July

22 incident, Mullen was moved.

Hecht testified that he recalled "no apprehension" from plaintiff concerning the move to cell

#533.  There was no indication that Mullen was an enemy.  Hecht did not know that plaintiff had

come to segregation from PC.  All of the information he had on either plaintiff or Mullen was that

contained on the Double Cell Evaluation prepared by correctional counselors.   That form contains

no indication that Mullen and plaintiff were enemies.

Noteworthy evidence offered by defendant is contained in defendant's Exhibit #8. That is a Cumulative Counseling Summary. It contains notes from various correction counselors concerning routine contacts with the inmates assigned to them. Exhibit #8 is plaintiff's summary. Plaintiff's move to cell 533 on June 10, 2002, is noted. It is described as "routine." Unspecified grievances are noted on June 20, and a grievance concerning plaintiff's diet shows up on July 12. No mention of Charles Mullen is made. The next entry is July 25, when plaintiff has another "routine" move to cell 755.

There is no record of a grievance filed between July 20 and July 22, 2002, concerning Charles Mullen.

The evidence supports the following factual findings:

1. Plaintiff was incarcerated in the IDOC on June 10, 2002.

2. On that date, plaintiff was moved into cell #533 of the segregation unit at Menard Correctional Center. That move was administered by defendant Daniel Hecht, an IDOC officer.

3. Plaintiff had been a protective custody inmate due to poor relations with the Gangster Disciples, a prison gang with which he had previously been affiliated.

4. Plaintiff was placed into cell #533 with inmate Charles Mullen, himself a Gangster Disciple.

5. IDOC had no record of Charles Mullen as a documented enemy of plaintiff.

6. Hecht relied on a Double Cell Evaluation, a regularly maintained IDOC document, to determine which inmates should not be double-celled together. That record gave no indication that Mullen and plaintiff were enemies and inappropriate for double-celling.

7. Plaintiff told Hecht that he should receive only a single-cell assignment.

8.  Despite that, Hecht placed plaintiff with Mullen.

9.  On July 20, 2002, Mullen attacked plaintiff, injuring him slightly.

10.  On July 22, 2002, Mullen again attacked plaintiff, causing him slight injuries for which he was treated and from which he suffers no residual affects.

11.  After the July 22, 2002, attack, Mullen and plaintiff were separated.

Prison officials have a duty to protect prisoners from attacks by other inmates. *Pope v. Shafer* 86 F.3d 90, 91 (7th Cir. 1996).  To prevail in a § 1983 lawsuit claiming a failure to meet that obligation, a prisoner must prove "a sufficiently serious deprivation, i.e. conditions which objectively 'pose a substantial risk of serious harm.'" Id. at 92 (citing, *Farmer v. Brennan*, 114 S.Ct. 1970, 1977). "The inmate also must show subjective culpability, establishing that the prison officlas acted either deliberately or with deliberate indifference to the inmate's health or safety.  This latter element requires that the official knows of and disregards an excessive risk to inmate health or safety.  The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.  Thus, in order to establish the liability of a prison official, a plaintiff must establish that the official knew of the risk (or a high probability of the risk) and did nothing.  In failure to protect cases, a prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety.  Mere negligence (for example if a prison guard should know of a risk but does not) is not enough to state a claim of deliberate indifference under the Eighth Amendment. It is also not sufficient to show that the prison guard merely failed to act reasonably." Id. at 92.

Plaintiff's original placement with Mullen is easily resolved using the foregoing standard. Hecht was entitled to rely on the Double Cell Evaluation.  This is so even though it does seem that

any system which ignores the fact that inmates can find themselves in jeopardy from any inmate with a certain gang affiliation is going to place prisoners in harm's way from time to time.   Plaintiff was estranged from the entire Gangster Disciples organization.   Contrary to what prison officials would care to acknowledge, that gang, and others, are ubiquitous forces within the penal structure. They have interests to tend to (enforcing their own codes of conduct, for example), and they will take care of business.  Merely protecting a prisoner from a named inmate with whom an antagonistic and dangerous relationship has been established will fall short of the mark occasionally.  Plaintiff's "enemies list," as it is referred to, should include all Gangster Disciple members.  It does not, however, and it is not known if that broad type of enemy listing is even possible.

The failure to move plaintiff after the first Mullen attack is a little more difficult to deal with, but plaintiff has failed to meet his burden under the law as it stands.  The evidence is wishy-washy concerning what Hecht knew, if anything, about the first attack.  Even if he knew something, the evidence does not prove that facts existed from which Hecht knew or actually inferred that a substantial risk of harm to plaintiff existed.  One might easily have concluded that had Mullen, a much larger and stronger inmate by plaintiff's own account, intended great harm to plaintiff, then he would have administered exactly that.  No such harm occurred.

For all the foregoing reasons, it is RECOMMENDED that judgment be entered against plaintiff Carter and in favor of defendant Hecht.

**SUBMITTED: February 6, 2007.**

*s/Philip M. Frazier*
**PHILIP M. FRAZIER**
**UNITED STATES MAGISTRATE JUDGE**